## Albert L. Ransom v. Phyllis Bebernitz, Chester C. Anderson, David Ransom, et al.

[782 A.2d 1155]

No. 00-142

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed August 24, 2001

424

*John D. Hansen*, Rutland, for Plaintiff-Appellee.

*Karl C. Anderson* of *Anderson & Eaton, P.C.*, Rutland, for Defendants-Appellants.

**Amestoy, C.J.** This appeal arises from a dispute among great great grandchildren over their respective rights to a certain tract of land conveyed by an 1882 probate decree according to the terms of their great great grandfather's will. Defendants, members of the Anderson family, appeal the Rutland Superior Court's judgment that plaintiff has a 9/31 interest in the subject land, and the court's order to partition of the property. Defendants assert that the trial court erred in concluding that (1) the 1882 probate decree is not subject to collateral attack on the ground that the will violated the rule against perpetuities; (2) the will did not violate the rule against perpetuities; (3) the defendants and their predecessors in title did not establish a claim for adverse possession; (4) plaintiff and his predecessors in title did not commit laches. We affirm.

On May 30, 1877, Albert Alanson Ransom executed a will that conveyed a parcel of land, hereinafter referred to as the northern mountain lot, to his son. The will provides, in pertinent part:

> I also give to my son Albert VanNess Ransom the use of one half of the remainder of my land joining my home farm on the North and running North to the Town of Hubbardton . . . I give to said Albert that part of the same lying North of such line. I give the same to the said Albert during his natural life and after his decease should children survive him I give the use of said land to them during their natural lives and to the survivor of them, and at the decease of the survivor of such children I direct that said land be divided among their children equally share and share alike.

On August 26, 1880, Albert Alanson Ransom died, and on September 20, 1880, his will was approved by the probate court. On February 27, 1882, the probate court issued a decree of distribution that was not appealed.

At the time of the testator's (Albert Alansom Ransom) death, his son Albert VanNess Ransom had only two children, Albert Anson Ransom, who was 1 year old, and Lillian Ransom Cook, who was in utero.

Subsequently, Albert VanNess Ransom had three additional children. Upon his death, on February 9, 1909, his life estate interest in that property expired, and the right of use and possession of the property passed to his five children: Albert Ansom Ransom, Lillian Ransom Cook, Grace Ransom Anderson, Marion Ransom Levanway, and Elihu C. Ransom, who each took a life estate as joint tenants with right of survivorship. Those five children eventually had thirty-one children, to whom the will intended to convey the remainder of the life estate divided in equal shares. Therefore, in 1989, when the last surviving grandchild of the testator — Marion — died, the will conveyed an equal distribution of the northern mountain lot among the testator's great grandchildren; that is, in 31 shares.

Fritz Anderson married Grace Ransom and, in 1915, he purchased the home farm that abuts the northern mountain lot from his mother-in-law. Their children, Ellis and Chester Anderson, purchased the farm from their father in 1940.

The Andersons did not use the northern mountain lot as a part of the farming operation, because the land is steep and not useful for farming. Other than for a small housewood logging operation in the 1930's, the Andersons did not use the property except for access to other property that they owned. On July 19, 1940, Fritz Anderson, acting as the agent of Albert VanNess Ransom's five children and all but two of his grandchildren (including defendants Chester and Ellis Anderson), sold and conveyed a portion of the property, and distributed money to them from the sale.

On January 11, 1991, Chester and Ellis Anderson conveyed the rest of the property to Ellis' sons, defendants Eric and Karl Anderson, by warranty deed. In this deed, defendants Chester and Ellis Anderson covenanted that they were the sole owners of the premises and had good right and title to convey the same. According to deeds in possession of defendants, seven other great grandchildren of the 21 who survived Marion Ransom Levanway, the last life tenant, had conveyed their remainder interests by quitclaim deeds to defendants Eric and Karl Anderson, but did not record the conveyance in the land records.

Plaintiff, Albert L. Ransom, is the son of Lemuel Ransom, one of the testator's thirty-one great grandchildren. After hearing from his father that the family owned some land in Hubbardton, he researched the genealogy and land records to inquire about the property. In 1988, he began approaching descendants of the testator, and offering them sums of money for their "share" of the estate. Since then, he has

acquired 9/31 of the property. Also in 1988, he offered to begin paying taxes on a share of the northern mountain lot. This offer was declined by Ellis and Chester Anderson.

Plaintiff brought a complaint in February 1995, seeking a judicial determination of the legal owners of the property and the ownership interest in each such owner, as well as partition of the portion to which the plaintiff is entitled together with an appropriate easement across the remaining portion of the land to provide reasonable access. The parties filed cross-motions for summary judgment, and a hearing was held on September 11, 1997 on the merits of plaintiff's claims and on defendants' motion for summary judgment.

The trial court found that the will did not violate the rule against perpetuities and that, even if it did, the 1882 probate court's decree of distribution was conclusive and not subject to collateral attack. The court also found that the defendants had not acquired the land by adverse possession and that the plaintiff did not commit laches. The court ruled that the plaintiff was entitled to a 9/31 share of the property, ordered partition of that share, and that the plaintiff was further entitled to access across other lands of the Anderson farm.

Defendants Chester, Ellis, Karl and Eric Anderson (defendants Anderson) appeal the trial court rulings, claiming that the testator's will is subject to collateral attack because it violated the rule against perpetuities. According to defendants Anderson, the rule against perpetuities violation defeats the conveyances set forth in the will, thus creating a tenancy in common between the children of Albert VanNess Ransom at his death in 1909. They further contend that, through their occupancy, they adversely possessed the land against their fellow tenants in common. Finally, defendants contend that the actions of plaintiff and his predecessors in title constituted laches, which bar plaintiff's recovery.

I

On appeal, defendants Anderson contend that Albert Alanson Ransom's will violated the rule against perpetuities, and that the probate decree of distribution of 1882 does not prevent the court from addressing that violation. Defendants, however, must first persuade us that *In re Estate of Walker* is either distinguishable from the instant case or was wrongly decided. 119 Vt. 130, 120 A.2d 565 (1956). They have done neither.

The *Walker* case involved the same situation as in this case: a subsequent collateral attack upon an unappealed probate decree. *Id.* at

132, 120 A.2d at 568. Relying on *In re Wells's Estate*, 69 Vt. 388, 38 A. 83 (1897), we held in *Walker* that an unappealed decree of the probate court, even if erroneous as a matter of fact or law, is conclusive as to all matters covered by the decree, including the provisions of the will there in issue, and is not subject to collateral attack. 119 Vt. at 136, 120 A.2d at 568.

Defendants attempt to distinguish *Walker* arguing that, unlike the probate court that reviewed Albert A. Ransom's will, the probate court in *Walker* had earlier addressed the issue of the rule against perpetuities and had found that the provisions of the will establishing the trust did not violate the rule. Defendants contend that the material findings set forth in *Walker* contain reference to a probate court's finding in 1907 (the date of decree of distribution) that the will in question violated the rule against perpetuities. But the findings referred to in the *Walker* decision are those of the probate court appealed in 1956. There is no evidence that the rule against perpetuities was considered by the original probate court when it entered a decree in accordance with the provisions of the will in 1907. Indeed, the *Walker* opinion assumes for purposes of its decision that the determination of the probate court in 1956 that the will probated in 1907 violated the rule against perpetuities is correct, but concludes with a statement of law directly applicable to this case:

> If the provision or provisions in the will creating the trust estate are now void under the rule against perpetuities they were so at the time the decree was entered. Here as there an appeal could have been taken to the decree and had it corrected, if erroneous.

*Walker*, 119 Vt. at 135, 120 A.2d at 568.

Defendants similarly fail to find support for their contention that a decree of the probate court cannot be considered conclusive unless it can be shown that the probate court initially addressed the issue of rule against perpetuities. Defendants' assertion that *Sparhawk v. Administrator of Buell*, 9 Vt. 41 (1837), and *In re Estate of Valiquette*, 122 Vt. 350, 173 A.2d 832 (1961), permit collateral attack on a probated will is inapposite because in those cases the subject matters before the Court were collateral issues to the decree that the probate court had adjudicated. See *Sparhawk*, 9 Vt. at 77-78 (in accounting proceeding, the court decrees which debts administrator is bound to pay, but whether payment has actually been made or not is not material to the question of accounting, and debtors are not precluded from pursuing

administrator for the recovery of their debt in a separate proceeding); *Valiquette*, 122 Vt. at 361, 173 A.2d at 839 (In an accounting proceeding, the probate court's approval of the accounting does not constitute res judicata to the allocation of stock to income or corpus unless the matter is directly brought before the court.).

The decree of distribution of the probate court construes the will and adjudicates the title to the beneficiaries, and its decree is not subject to collateral attack. See *Sparrow v. Watson*, 87 Vt. 366, 370, 89 A. 468, 470 (1914). Even if the probate court committed an error in construing the will, its unappealed decree is binding:

> [In making the decree] [t]he construction given to the will was a legal construction, and became the law governing the distribution of the estate. If there was an error in the distribution of the estate, it was an error of law; and the remedy was by appeal to the higher court. No appeal having been taken, the law as then interpreted by the court became the law of the case. The construction thus given to the will was a judicial construction. Property rights vested under it; and, for error in that construction, they cannot now be disturbed.

*Leavins v. Ewins*, 67 Vt. 256, 257, 31 A. 297, 297 (1894).

In addition to failing to distinguish the matter before us from *Walker*, defendants have suggested no plausible reasons for reversing an opinion that is consistent with Vermont case law and statutes intended to avoid a harsh and archaic application of the rule against perpetuities. See *Wells's Estate*, 69 Vt. 388, 38 A. 83; *In re Peck's Estate*, 96 Vt. 183, 118 A. 527 (1922). We further note that in 1957 there was a significant transformation in the application of the rule against perpetuities in Vermont. In that year, the Vermont Legislature passed a "wait-and-see statute," 27 V.S.A. §§ 501-503, which rejected the strict enforcement of the rule and provided that the period of perpetuities be measured by actual rather than possible events.[1] The statute specifically rejected a retroactive application by stating that its provisions would apply only to wills and instruments taking effect after the enact-

---

[1] 27 V.S.A. § 501 reads:

> Any interest in real or personal property which would violate the rule against perpetuities shall be reformed, within the limits of that rule, to approximate most closely the intention of the creator of the interest. In determining whether an interest would violate said rule and in reforming an interest the period of perpetuities shall be measured by actual rather than possible events.

ment of the statute.[2] However, the combined effect of this statute with the *Walker* decision, which precluded collateral attacks on unappealed decrees, reformed the application of the rule in the state of Vermont in already settled estates as well as in future instruments.[3]

## II

In their answer, defendants Karl and Eric Anderson assert as an affirmative defense that they and their predecessors in title, Chester and Ellis Anderson, and their predecessor in title Fritz Anderson have acquired title to the subject property by virtue of adverse possession. Defendants claim that they had used and possessed the land exclusively since 1915 when Fritz and Grace Anderson bought the home farm that abuts the northern mountain lot. They further argue, but were unable to prove, that Fritz Anderson first, and then his

---

[2] In pertinent part, the statute reads: "This subchapter shall apply only to inter vivos instruments and wills taking effect after the subchapter becomes operative . . . ." 27 V.S.A. § 502.

[3] Since *Walker* precludes a collateral attack to the 1882 distribution decree, it is unnecessary to reach the issue of the rule against perpetuities to decide this case. We note, however, that there was no violation of the rule. Under the orthodox rule against perpetuities no future interest in property is valid unless it must vest not later than 21 years (and the period of actual gestation) after some life in being at its creation. *Peck's Estate*, 96 Vt. at 186, 118 A. at 528. At the time of the testator's death, in 1880, two of his grandchildren were in being: Albert Ansom Ransom, who was 1 year old, and Lillian Ransom Cook, who was in utero. Albert died in 1951 and Lillian in 1970. All of the great grandchildren to whom the testator intended to give the fee in the property at issue were born between 1899 and 1939, that is, during the lives of both Albert and Lillian. As soon as they were born, the thirty-one great grandchildren took vested remainder interests in the property, which became indefeasibly vested upon the death of testator's son, Albert VanNess Ransom in 1909. Defendants contend that the remainders of the great grandchildren would not vest until the death of the last surviving grandchild, Marion Ransom Leavanway, in 1989. However, there is no provision in the will making the remainder contingent upon survival of the last life tenant, and such provision cannot be implied. The law favors early vesting, and no estate will be held contingent unless positive terms are employed in the will indicating a contrary intention. *In re Robinson's Estate*, 90 Vt. 328, 332, 98 A. 826, 828 (1916). When a will is fairly open to two constructions, one of which will turn a bequest into an illegal perpetuity, and the other will make it valid and operative, the latter should be preferred. *Peck's Estate*, 96 Vt. at 187, 118 A. at 528. Therefore, absent a specific provision to give a remainder contingent upon survival of the last life tenant, the remainder vested at the earliest possible time; that is, after Albert VanNess Ransom's death, as soon as the first great grandchild was born. The first of those great grandchildren was Ann Ransom, born in 1889, and the last is Anna V. Ransom Fryzell, born in 1939. Lillian A. Ransom Cook died in 1970. Therefore, the remainder vested well within the twenty-one-year period after Lillian's death set by the rule against perpetuities.

children, paid all of the real estate taxes on the northern mountain lot until 1991.

■ "In this state, adverse possession is accomplished through open, notorious, hostile and continuous possession of another's property for a period of fifteen years." *Moran v. Byrne*, 149 Vt. 353, 355, 543 A.2d 262, 263 (1988) (internal quotations and citations omitted); 12 V.S.A. § 501. Defendants suggest that the statute had commenced to run in 1915; however, neither Fritz nor Grace Anderson could have commenced the adverse possession of the property at that time. Grace Anderson held a life estate in the northern mountain lot; thus, she could not adversely possess against the remaindermen. A life tenant who takes possession admits her right as it was created by the deed, and cannot repudiate the character of the possession that she lawfully holds to assert possession of a different character. See *Ford v. Flint*, 40 Vt. 382, 398 (1867). Moreover, the statute will not commence to run against a remainderman until his right of possession commences. See *Bailey v. Woodbury*, 50 Vt. 166, 170 (1877). This rule is based on the proposition that the remainderman does not have a right of entry and possession during the existence of the life estate, and any right of action for possession does not accrue until the death of the life tenant. See *Webster v. Cooper*, 55 U.S. (14 How.) 488, 500-01 (1852).

■ Since Grace Anderson could not, as a matter of law, adversely possess the property, her husband, Fritz Anderson, could only have commenced the adverse possession of the property if he were able to adversely possess the land against his own wife, the other life tenants and remaindermen. However, "a husband who takes possession of his wife's land under his right as her husband takes and holds for her, his possession is not adverse, and can never ripen into title." *Superior Oil Corp. v. Alcorn*, 47 S.W.2d 973, 978 (Ky. 1930). See also *Union Oil Co. v. Stewart*, 110 P. 313, 315 (Cal. 1910) (neither spouse can acquire title by adverse possession as against the other in lands of which they have joint use during the continuance of the marriage relationship, at least in the absence of color of title). Moreover, in 1940 Fritz acted as agent, attorney and trustee in the distribution among the life tenants and remaindermen of the proceeds of the sale of a portion of the northern mountain lot. This is inconsistent with any claim of title by adverse possession on the part of Fritz Anderson, since he was in fact recognizing the ownership and interests of the life tenants and remaindermen.

■ Chester and Ellis Anderson, Fritz and Grace Anderson's children, did not take the clear, unequivocal steps that would be needed to adversely possess the property during the period of the life estates of the grandchildren. "Where a family relationship between claimants is involved, proof of adverse possession must be established by stronger evidence than is required in other cases." *Harlow v. Miller*, 147 Vt. 480, 484, 520 A.2d 995, 998 (1986). "In such a situation, the possession of the land of the one by the other is presumptively permissive and amicable." See *id.* (internal quotations and citations omitted). In addition, presumption against ouster of a co-tenant can be overcome only "by some overt and notorious act or acts of an unequivocal character, indicating an assertion of ownership of the entire premises to the exclusion of the right of the co-tenant." See *Scott v. Leonard*, 119 Vt. 86, 102-03, 119 A.2d 691, 700 (1956).

■ Defendants predicate their adverse possession claim on payment of the taxes levied against the subject land; however, the law presumes that payment of taxes by one co-tenant is on behalf of other co-tenants. *Adm'rs of Downer v. Smith*, 38 Vt. 464, 468 (1866); see also *In re Estate of Neil*, 152 Vt. 124, 129, 565 A.2d 1309, 1312 (1989). In addition, the obligation to pay taxes was an obligation of the life tenants; therefore, if Chester and Ellis Anderson paid taxes before their remainders became possessory, they had a right of recovery from the life tenants. See *Town of Brattleboro v. Smith*, 117 Vt. 425, 428, 94 A.2d 407, 409-10 (1953). Their failure to seek reimbursement from the life tenants does not create any claim against the remaindermen and their successors.

■ Furthermore, Chester and Ellis Anderson could not as a matter of law acquire title by adverse possession as against the other remaindermen prior to 1989, when the life estate expired and the remainder interests became possessory. Where a life estate and remainders in two or more persons have been created in real estate, and the life tenant is still living, the co-remaindermen have a fiduciary relationship to each other that no one of them may impair the rights or interests of his co-remaindermen. *Givens v. Givens*, 387 S.W.2d 851, 853 (Ky. 1965). Therefore, any interest that they could have acquired prior to 1989 was held in a fiduciary capacity for the benefit of all the remaindermen.

■ Finally, any possession of the northern mountain lot by either Chester, Ellis, Eric or Karl Anderson subsequent to 1989, when the remainder interests became possessory upon the death of the last

surviving life tenant, is not sufficient to establish a claim of adverse possession because the possession has not been of sufficient duration to satisfy the requisite statutory period of fifteen years. 12 V.S.A. § 501.

## III

Defendants also assert laches as an affirmative defense. As articulated in *Chittenden v. Waterbury Center Community Church*, 168 Vt. 478, 494, 726 A.2d 20, 30 (1998), "[l]aches is the failure to assert a right for an unreasonable and unexplained period of time when the delay has been prejudicial to the adverse party, rendering it inequitable to enforce the right." (internal quotations and citations omitted). The delay must be "unexcused" and prejudicial. *Estate of Neil*, 152 Vt. at 132, 565 A.2d at 1314. We agree with the trial court's observation that if the doctrine of laches has any applicability in this case, it would be more equitable to apply it against defendants than plaintiff. Plaintiff and his predecessors in title had no possessory rights in the subject property until the death of the last life tenant, Marion Ransom Levanway; thus they could not assert those rights before 1989. In contrast, defendants' claims based on the rule against perpetuities and adverse possession could have been brought many years ago. There is no basis for disturbing the trial court's conclusion that laches does not bar plaintiff's claim. "[L]aches is so much a matter of discretion by the lower court that its action will not be disturbed unless clearly shown to be wrong." *In re Vermont Elec. Coop.*, 165 Vt. 634, 635, 687 A.2d 883, 885 (1994) (internal quotations and citations omitted).

*Affirmed.*